RENTONIA JENICE MOORE, )
                          )
    Plaintiff/Appellee,        )
                          )        Appeal No.
v.                        )        M1999-01680-COA-R3-CV

# FILED

**December 10, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

                          )
LEONARD MOORE,            )        Davidson Circuit
                          )        No. 95D-2066
    Defendant/Appellant.  )


COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


THE HONORABLE MURIEL ROBINSON, JUDGE


MARY FRANCES LYLE
Bruce, Weathers, Corley, Dughman & Lyle
First American Center, 20th Floor
315 Deaderick Street
Nashville, Tennessee 37238-2075
    ATTORNEY FOR PLAINTIFF/APPELLEE


MARY ARLINE EVANS
214 Third Avenue North
Nashville, Tennessee 37201
    ATTORNEY FOR DEFENDANT/APPELLANT

AFFIRMED AS MODIFIED
AND REMANDED

WILLIAM B. CAIN, JUDGE

# O P I N I O N

This case involves the divorce of parties who are the parents of two young children. The trial court granted a divorce to the mother. In addition, the court placed custody of the parties' children with the mother and scheduled visitation with the father. On appeal, the parties raise issues involving the lower court's findings with regard to custody, child support, the division of property and the award of attorney fees. The decision of the trial court is affirmed in part and reversed in part.

## I. FACTS

Rentonia Jenice Moore ("the mother") and Leonard Moore ("the father") are the parents of two daughters, Ashley and Chelsea, who were ages four and two years at the time of this trial. Overall, an unhappy and unstable picture of the parties' marriage was painted at trial by the different witnesses. While the parties spent most of their marriage living together in the Nashville area, they lived apart for almost a year and a half when the father was stationed in North Dakota while in the military. From the evidence presented at trial, the parties experienced marital troubles before, during and after the father's stay in North Dakota.

Much of the evidence focused on the father's alleged adulterous relationship with another woman. The mother testified that, in May of 1991, when the parties learned that the mother was pregnant with their first child, the father told her that he was in love with this woman. Soon thereafter, he left the household. Following the birth of their first child, the parties reconciled. However, according to the mother, she learned that the father was still seeing the same woman around the time that the second child was born in October of 1994. At trial, the father denied any romantic involvement with this woman. However, photographs and phone records introduced as evidence at trial support a conclusion that the father was involved in an extra-marital relationship with this woman.

Another significant subject at trial involved the father's past acts of violence toward the mother. The mother told of one particular incident which arose out of a dispute over an income tax refund. Though the parties had filed separate tax returns in 1994, the father wanted half of the mother's refund from that year. The mother testified about an intense struggle that she had with the father on May 1, 1995 at their home. She said that he chased her around their house, pushed her into the pantry and attempted to keep her from calling the police. As she tried to escape, he chased her while wielding an electric drill. The next day, the father came to the mother's school and demanded that she write a check for half the amount of the tax refund. He knocked everything off the mother's desk and threatened to kill her. As a result of this incident, the father was convicted of assault and forced to leave the home.

The mother testified that there had been other incidents of violent behavior. She said the father would become angry when she would not agree with him or do what he wanted her to do. She said that "[h]e would throw things, kick things, [and that he had] kick[ed] the front door in once, things such as that." She told of one episode that occurred outside of the courthouse after the court had set child support. When the parties walked out to the car to transfer the car seat from the mother to the father for his visitation with the children, the father kicked the car seat

down the street.

The father admitted that he kicked the car seat under duress. He also admitted that he pulled the telephone cord out of the wall during the May 1, 1995 altercation. It was his position that he did so to prevent an embarrassing situation and to protect the mother's career with the school system. He explained that he did not lock the mother in the garage but rather "she was running out of the house, no clothes on, acting irrational. So [he] tried to really contain the situation until she calmed down." The father denied that he had chased the mother with a drill or that he had acted violently at the mother's school the following day.

A co-worker and friend of the mother's, Nancy Stewart, witnessed the May 1995 altercation at the mother's school. She heard a loud crash come from the mother's room, saw the mother and Ashley run from the room and observed that the mother's desk was overturned and that her wrist was bleeding. Ms. Stewart said that the father, who was very upset, left the school building stating that he hated the mother and was going to kill her. Despite the fact that Ms. Stewart pleaded with him not to leave with the parties' younger child, he drove off "really fast" with the child in his car.

The father testified that the mother exhibited general abusive behavior. He said there was a time in 1991 when he was getting physically sick because of the abuse. He said that the mother had "throw-down, drag-out" fights with her sister in front of the children. However, there was no significant corroboration of the father's characterization of the mother as a violent person. His only evidence to that effect was the testimony of one of his sisters who had heard the mother make derogatory remarks about the father over the phone on one occasion. On the other hand, the mother's witness and friend, Ms. Stewart, stated that the mother was a "[h]appy person, quiet mannerisms, well liked by faculty and by students and parents, very easy to get along with, helpful." She had observed the mother interacting with her children, playing with them, talking to them and disciplining them.

The father called Geral Jones to testify on his behalf. Ms. Jones, a pastor and director of the day care where Ashley attended for a couple of years, testified that the mother dropped off and picked up the child most of the time. However, when the father was in town "a few times," she had the opportunity to witness his interaction with the child. She testified that she never saw him exhibit any anger and that he always acted appropriately toward Ashley. Ashley was always appropriately dressed and seemed well-cared for. Ms. Jones opined that Ashley had a very strong attachment to the father because she was the most excited when she was going to visit him and because she missed him when he was away.

It was the father's position that he and the mother shared the duty of caring for the children. The mother's testimony was that she had been the children's primary care-giver: she had fed them, cared for them when they were sick, taken them to doctors' appointments and transported them to day care. She testified that she was involved in church by teaching children on both Sunday morning and Wednesday night. During the time that the father was in North Dakota, the mother left the older child with him for the last two months of the school year while she finished teaching in Nashville. She explained that she did this because she was in the beginning stages of her second pregnancy and was tired. The mother testified that, for a time from June 7 to July 8, 1995, the father did not exercise visitation with the children. She said that he stopped sending support checks in March of 1994 when he was in North Dakota. Also, he failed to pay child support for a period beginning in August 3, 1995 such that he accumulated an arrearage of $3,186 by July of 1996.

The mother explained that she had wanted separate tax filing because the father was not having any money withheld from his salary for taxes and yet, at the same time, he was not sending her any money to support the family during the time that he was in North Dakota. The parties' second baby was born in October of 1994, and it was the mother's testimony that she took financial care of the family during the entire period of her pregnancy. She testified that she paid the house note

and the car note as well as the bills for utilities and day care.

At the time of trial, the mother had been an elementary school teacher for ten years and was receiving an annual salary of $35,000. She testified that she had a pension valued at $11,869 and two annuities valued at $2,433 and $150. Regarding the parties' real property, the mother testified that this property was worth $75,900 which was the amount of its 1995 tax appraisal. However, the court ordered a post-hearing appraisal of the property which valued the property at $83,000. There was a $69,123 mortgage which, when subtracted from the home's value, left $13,877 in equity. The only other property at issue was the silverware, crystal and china which the father claimed to have purchased in England before the parties married.

At the time of trial, the father had been working at Bridgestone/ Firestone since May of 1995. Documentation from Bridgestone/Firestone was entered into evidence which showed the father's gross income for the second half of 1995, from May 15 to the end of the year, to be $39,824.21 and for the first half of 1996, through the end of June, to be $35,568. The father stated that he was working sixteen hour days and making time and a half for his overtime. He testified that he had been working to pay the court-ordered support. He said that overtime work was no longer always available as it had been. He conceded that he received a $749 bonus in July of 1996 which was over and beyond his hourly wage. At trial, a copy of one of the father's most recent paychecks from July 13, 1996 was entered into evidence, showing a gross pay of $1,396.76 for one week of work including overtime. Once all deductions were taken, including child support, the check revealed a net of $677. A bonus check of $482 was issued the same week.

Regarding his failure to pay child support for a period, the Husband explained that an employee at the court had advised him not to pay until a court order was in place though he had tried. He stated that when his employer did not garnish his wages in the amount specified by the court, he did not voluntarily pay into court the balance because he was no longer making the same amount of money.

He later stated that he had not realized there was a deficit until he was in a deposition.

The employees' assistant representative from Bridgestone/Firestone, Raymond Burns, was a trial witness. He testified that the father had been working a lot of overtime recently due to him being one of the least senior people and due to the fact that there was much available work in the face of a certain contract negotiation. This overtime would not be available once a certain contract was settled, however, that could be months or years. Additionally, Mr. Burns expressed concern about the father working so many hours since his was a hard and dangerous job. Mr. Burns asserted that the father's basic weekly salary without overtime was $695. With the sixteen hours per month of overtime that he was currently able to work, his weekly salary was essentially $795.

## II. RULING OF TRIAL COURT

The trial court granted a divorce to the mother on the grounds of the father's inappropriate marital conduct. With regard to the parties' two daughters, the court granted the mother sole custody and the father visitation. Child support was set in the final decree at $810.00 per month which would be reduced to $675.00 for the month of July, the entirety of which the children would spend with the father. The court ordered the father to maintain health insurance on the children as well as a life insurance policy on his own life. It also ordered him to keep the mother on his group health insurance plan for six months or until she could obtain her own health insurance with the proviso that she take immediate steps to do the same. The mother was awarded a judgment against the father in the amount of $3,578.40 for child support arrearage. Additionally, the court ordered the father to pay the mother $3,000 toward her attorney fees.

Regarding the division of the parties' marital property, the trial court awarded to the mother the parties' jointly-owned home place as her sole property. The court awarded also to the mother as her sole property her pension and annuities "in consideration of her contribution in maintaining and preserving the equity in the marital residence." To the father, the court awarded the 1993 Ford Explorer. The household goods and furnishings were divided as the mother had requested except that the china, silver and crystal were divided equally between the parties.

### III. CUSTODY

The first issue involves the trial court's award of custody. In any award of custody, the needs of the child are paramount and every effort is made to promote the child's interest by placing him or her in an environment that will best serve his or her physical and emotional needs. *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); Tenn. Code Ann. § 36-6-106 (Supp. 1998). Determining the custody arrangement that serves a child's best interest entails a factually-driven decision which requires the careful consideration of numerous factors. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). These factors include the following:

> the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third-party support; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (*quoting Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983)); *see also* Tenn. Code Ann. § 36-6-106 (listing the factors to be considered in the award of custody).

The courts must undertake a "comparative fitness" analysis of the parents to determine which one is comparatively more fit than the other. *See In re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); *Bah v. Bah*, 668 S.W.2d at 666. In so doing, "courts understand that each parent has his or her own vices and virtues . . . [and] do not base their custody decisions on which parent is "perfect," . . . Rather, custody decisions require the courts to determine which of the available custodial alternatives appears to be best calculated to meet the child's needs." *Lance v. Lance*, No. 01A01-9801-CV-00036, 1998 WL 748283, *2 (Tenn. Ct. App. 1998) (citations omitted).

"Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. . . . [A]ppellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law." *Gaskill*, 936 S.W.2d at 631 (*citing D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995)). Accordingly, we review custody and visitation decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d).

In the instant case, the pivotal question with regard to the trial court's custody decision is whether the evidence preponderates against the court's conclusion that the mother is comparatively more fit than the father to be the custodian of their two daughters. Based on our independent review of the record, we cannot say that the proof fails to support the trial court's decision to place these two children with the mother. It appears that the mother has been the children's primary care-giver for most of their lives. With the exception of two to three months, the mother had Ashley by herself for the entire fifteen month period that the father lived in North Dakota. The father attempts to use the fact that the mother left

Ashley with him for two months of that period while she was pregnant and teaching school as evidence that the mother believed the father could properly care for the children. However, even if this is evidence that the mother trusted the father to take care of Ashley for a few months, it does not mean that he is the more fit parent to be the children's primary custodian.

The mother's friend and co-worker, Ms. Stewart, testified that the mother interacted well with the children, both disciplining and playing with them. Ms. Stewart testified that the mother was a happy person with quiet mannerisms who was well-liked in the work environment. Even the father's witness, Geral Jones, testified that it was the mother whom she saw most often picking up and dropping off Ashley whom Ms. Jones thought was a well-adjusted child. While the father apparently called her as a witness to testify that he acted appropriately toward the child, Ms. Jones testified that she only saw the father with Ashley a "few times."

Not only does the record establish that the mother has provided a more stable emotional environment for the children, but it also shows that she has been the parent who has more consistently borne the financial responsibility for this family. During the time period that the father was in North Dakota, he did not send financial support to the mother. The mother maintained the mortgage payments as well as insurance premiums. The mother more consistently has provided the children with material support as well as emotional care throughout their young lives. Accordingly, we affirm the trial court's decision awarding the mother sole custody of the children.

## IV. DIVISION OF MARITAL PROPERTY

The father claims that the division of the marital estate was inequitable because the court awarded the mother virtually all of the marital assets. On appeal, he requests that the court divide equally between the parties the entire marital estate including the equity in the home, the mother's pension, her two annuities and the

parties' 1993 Ford Explorer.  The evidence at trial was that the parties had $13,877 equity in their home and $5,656 equity in their vehicle, that the mother's pension was worth $11,869 and that the mother's two annuities were worth approximately $2,583.

As already stated, the mother was awarded the home, her pension and her two annuities and the father was awarded the Ford Explorer.

A trial court has broad discretion in dividing the marital estate, and thus an appellate court gives great weight to a trial judge's division of marital property. *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983); *Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994).  The distribution of marital property need not be equal so long as it is equitable. *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997).  A court's division must be made without regard to marital fault, Tenn. Code Ann. § 36-4-121(a)(1) (1996), and must be guided by the following factors found in Tennessee Code Annotated section 36-4-121(c):

> (1)  The duration of the marriage;
> (2)  The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3)  The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4)  The relative ability of each party for future acquisitions of capital assets and income;
> (5)  The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6)  The value of the separate property of each party;
> (7)  The estate of each party at the time of the marriage;
> (8)  The economic circumstances of each party at the time the division of property is to become effective;
> (9)  The tax consequences to each party;  and
> (10) Such other factors as are necessary to consider the equities between the parties.

In addition, section 36-4-121(d) provides that "[t]he court may award the family home and household effects, or the right to live therein and use the household effects

for a reasonable period, to either party, but shall give special consideration to a spouse having physical custody of a child or children of the marriage." This court will ordinarily defer to the trial judge's decision unless it is inconsistent with the section 36-4-121(c) factors or is not supported by a preponderance of the evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

We find that the trial court's division of property is an equitable division consistent with the statutory factors and supported by a preponderance of the evidence. The father did not contest the mother's valuation of the parties' marital assets as established at trial and, for the home, as established by the court-ordered, post-trial appraisal. The mother received a portion of the estate worth $28,329 which includes the value of the home equity as well as that of her pensions and annuities. The father was awarded $5,656 of the marital property which represents the equity in the parties' vehicle. However, the trial court also set aside a judgment against the father for $3,578 in child support arrearage such that the award to the father totaled $9,234.

While the mother was awarded a larger portion of the marital estate, the circumstances of this case justify the disparity. As the statute permits, the trial court considered the mother's contribution to maintaining and preserving the equity in the marital home place. There was certainly testimony to the effect that for a period, the mother paid the mortgage, the insurance payments and supported the children with little to no help from the father. Furthermore, the economic circumstances of the parties as of the time of division warrant the disproportionate division. The father has demonstrated a far greater earning potential than the mother. He began his job at Bridgestone/Firestone in May of 1995 and between May and December of 1995, he earned $39,824. Between January and June of 1996, he earned $35,568 which is tantamount to an annual average income of $69,592. By contrast, the mother makes $35,000 per year. Finally, with regard to the award of the home place to the mother, as the primary custodian of the children, she is statutorily entitled to special consideration to receive the home. For all of these reasons, we affirm the trial court'

s division of property.

## V.  CHARACTERIZATION OF CHINA, SILVER AND CRYSTAL
## AS MARITAL PROPERTY

In his next issue, the father challenges the trial court's finding with regard to the china, silver and crystal.  The court ordered that these items be divided one half to each party despite the father's testimony that he had purchased these items in England before the parties  married.  As the father claims, his testimony was uncontroverted by the mother.  Indeed, she never offered any proof with respect to the china, silver, and crystal.  The code defines "separate property" as "[a]ll real and personal property owned by a spouse before marriage."  Tenn. Code Ann. § 36-4-121(b)(2)(A) (1996).  Our courts have recognized that separate property may become part of the marital estate if its owner treats it as if it were marital property. *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988).  While it is reasonable to surmise that the china, silver and crystal were treated as marital property during the marriage, there was no evidence to that effect.  In view of the limited evidence in the record below, we must hold the trial court erred in finding that this particular property was marital property.  We therefore reverse the court as to this finding and order that the china, silver and crystal be awarded solely to the father.

## VI.  CHILD SUPPORT

We turn next the trial court's award of child support.  The mother claims the court erred  because it did not base child support on the father's actual income.  In the final order, child support was set at $810 per month to be reduced to $675 for the month that the children would spend with the father.  The evidence was that the father began work at Bridgestone/Firestone in May 1995.  His actual earnings for the period between May and December 1995 were $39,824 which is an average of $4,978 per month.  For the first six months of 1996, the father earned $35,568 which

averages $5,928 per month. Therefore, his actual average monthly earning for his thirteen months at Bridgestone/ Firestone was $5,799.

The child support award of $810 per month comports with an annual income of $40,200. The trial court did not explain why it had not based child support on the father's actual earnings. The court did state that it would review the child support in January of 1997; however, when the mother filed a petition for review in February of 1997, the court declined to hear the matter. Deviation from the guidelines is permitted under certain circumstances none of which exist here. We therefore order that the child support award be set at $1,313 which is the guideline amount corresponding to monthly earnings of $5,799. *See* Tenn. Comp. R. & Regs. tit. 19, ch. 1240-2-4-.03(4) & (5) (1994).

Lastly, we address the father's challenge involving the fact that the amount of child support was based upon an income consisting in part of overtime payments. At trial, the father asserted that he had been forced to work a gross amount of overtime in order to comply with the court order. We have set child support based upon the average of the father's monthly income for thirteen months prior to trial as derived from employee records from Bridgestone/ Firestone. Gross income clearly includes overtime pay. Tenn. Comp. R. & Regs. tit. 19, ch. 1240-2-4-.03(3)(a); *see Robertson v. Robertson*, No. 03A01-9711-CV-00511, 1998 WL 783339, at *5 (Tenn. Ct. App. 1998). The father did not establish that he will not be earning overtime in the future. While the witness, Mr. Burns, testified that overtime work at Bridgestone/Firestone would one day be less available, he stated that this day could be months or years away. Based upon this record, the trial court properly included the father's overtime pay as income in determining the amount of child support. *See Whisenhunt v. Whisenhunt*, No. 02A0-19506-CV-00126, 1997 WL 305296, at *3-*4 (Tenn. Ct. App. 1997). In closing, we note that while the guidelines ensure that children receive the benefit of their obligor parent's income should that parent work overtime, this court can not force the father to work overtime. Should a future " significant variance" in the father's income occur, he certainly has the right to

petition the court for a modification of support. *See* Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 1998).

## VII. ATTORNEY FEES

Pursuant to the authority of Tennessee Code Annotated § 36-5-103(c), courts have wide discretion in awarding attorney fees, and this court will not interfere in the exercise of that discretion in the absence of a clear showing of abuse. *See Salisbury v. Salisbury*, 657 S.W.2d 761, 770 (Tenn. Ct. App. 1983). The trial court's award with regard to attorney fees need only be just and equitable under the circumstances. *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992). The mother's attorney submitted an affidavit showing her total fees and expenses to be $7,578.10 and there was neither proof nor allegation that this figure was inaccurate. The court ordered the father to pay to the mother's attorney $3,000 of these fees and expenses. We find that the court did not abuse its discretion in ordering the father to pay less than one half of the attorney fees and expenses that were incurred in representing the mother.

In addition, we find that the mother is entitled to attorney fees incurred in the appeal of this case. This court has the authority to award attorney fees for legal services rendered on appeal. *Seton v. Seton*, 516 S.W.2d 91 (Tenn. 1974). While we ruled in the father's favor on one of the issues, the award of the china, silver and crystal, we have found for the mother on all of the substantial issues of this case particularly the custody and support of the two minor children. Under such circumstances, this court is of the opinion that the father should pay the mother's attorney fees and related expenses in connection with this appeal. Upon remand, on hearing such proof as is deemed necessary, the trial court shall fix the mother's attorney fees incurred on appeal, for which the father will be responsible.

## VIII. CONCLUSION

The decision of the trial court is affirmed with respect to the custody of the parties' two minor daughters and the division of marital property. However, we find that the sparse evidence relating to the china, silver and crystal mandates a finding that these items are the father's separate property, and accordingly, we award them to him. We increase the trial court's award of child support to $1,308 per month which is consistent with an application of the guidelines to his average salary for the thirteen months prior to trial. Finally, we affirm the court's order that the father pay $3,000 of the mother's attorney fees incurred at trial, and we remand this case for a determination of the fees incurred by the mother on appeal so that the father might be ordered to pay these as well. Costs of this appeal are divided equally between the parties.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE